**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03873

ANNE MARIE HUKRIEDE, and
her minor child V.H.,

      Plaintiffs,

v.

AETNA LIFE INSURANCE COMPANY,

      Defendant.

---

**COMPLAINT**

---

Plaintiffs, Anne Marie Hukriede and her minor child, V.H., by and through their counsel, Bradley A. Levin, Robyn Levin, and Annika K. Adams of LEVIN SITCOFF PC, for their Complaint against Defendant, Aetna Life Insurance Company, state and allege as follows:

**<u>INTRODUCTION</u>**

This case is about a little girl who, like many children, loves to dance, play, and be active. Unfortunately, this child – at 12-years-old – has been diagnosed with adolescent idiopathic scoliosis ("AIS"). For decades, the standard treatment for this condition was posterior spinal fusion ("PSF"), a life sentence of immobility and fragility. But the FDA has approved a device for children just like V.H., which is specifically designed to correct scoliosis in children whose spines are still growing. The device, approved exclusively for use in vertebral body tethering ("VBT") surgery for young patients, relies on remaining spinal growth to straighten out a patient's spinal curvature so that the spine will settle into a healthier position over time. The difference between these two procedures is remarkable. Unfortunately, V.H., who is an ideal candidate for the less-invasive and

mobility-preserving procedure, which would give her the chance at a full, healthy, normal life filled athletic endeavors and freedom of movement, was denied coverage for this procedure by Aetna Life Insurance Company's ("Aetna").

Aetna denied coverage in an ill-considered process which entirely failed to account for the fact that not all scoliosis patients are the same, and that for the unique set of patients to which V.H. belongs, VBT is a safe, effective, and FDA-approved procedure. To make matters worse, the procedure is inherently emergent. Its effectiveness depends on getting the timing just right, which can come down to a matter of weeks or months during which the spine is at the most appropriate state of growth. This means that Aetna's denial cannot be reconsidered a year down the line – for V.H., it is now or never. For this reason, Anne Marie and V.H. bring this action to enforce their rights under the Plan, to overturn Aetna's unlawful denial of coverage, and to ensure that decisions about V.H.'s future, including her ability to dance, move, and live without avoidable lifelong limitations, are made on the basis of sound medicine and a good-faith claims process, rather than unsupported and vague assertions of "insufficient evidence," reliance on outdated clinical data, and failure to scrupulously analyze V.H's specific case.

## **PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiffs Anne Marie Hukriede and V.H. ("Plaintiffs") are and were at all times pertinent individuals residing in the State of Colorado.

2.      V.H. is a minor child and is identified in this pleading only by initials in accordance with Fed. R. Civ. P. 5.2(a)(3). V.H. brings this action through her mother and next friend, Anne Marie Hukriede.

3.     Defendant Aetna Life Insurance Company ("Aetna") is, upon information and belief, a corporation existing under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

4.     Upon information and belief, Aetna is an insurance company authorized to conduct insurance business in the State of Colorado and was conducting insurance business in the State of Colorado during all relevant times.

5.     This Court has personal jurisdiction over Aetna pursuant to the Colorado long-arm statute, C.R.S. § 13-1-124(a) and (b).

6.     This Court has jurisdiction over all claims asserted herein pursuant to 29 U.S.C. § 1132.

7.     Venue is proper in this district because all events giving rise to the claims occurred in the District of Colorado.

### GENERAL ALLEGATIONS

8.     V.H. is a vibrant, adventurous, and active twelve-year-old. She dances on a competitive dance team, enjoys learning in school, and spends her free time with family and friends. [Exhibit 1].



9.      Also, V.H. plays tennis and skis, enjoys traveling, and loves family vacations to the beach.

10.     V.H.'s participation in dance has provided her with a close community of friends, the opportunity to challenge herself and build confidence, and greatly contributes to her mental well-being.

11.     All of V.H.'s athletic endeavors will be affected by her AIS, unless she receives treatment that is adequate and appropriate.

A.      **Medical History**

12.     After doctors discovered a curve on her spine during a routine examination in September of 2024, V.H. was evaluated for scoliosis.

13.     On September 3, 2024, medical providers took x-rays of V.H.'s spine, which revealed an abnormal sideways curvature consistent with scoliosis.

14.     The x-ray imaging showed a 32-degree curve in V.H.'s upper and mid-back (thoracic) between the fourth and tenth thoracic vertebrae (known clinically as a "Cobb angle").

15.     The x-rays also revealed that V.H.'s thoracic curve bends to the right, while a compensating curve in her lower back bends to the left.

16.     V.H. was diagnosed with AIS, a form of pediatric scoliosis occurring in individuals between the ages of 10 and 18.

17.     So, beginning in November of 2024, at the direction of her doctors, V.H. began wearing a brace in an effort to slow the progression of her spinal curvature.

18.     The standard of care for the treatment of AIS involves an initial course of bracing, a non-surgical treatment aimed at preventing a patient's spinal curve from worsening.

19.     If bracing fails, the standard of care calls for additional and more invasive treatment, such as surgical intervention, to correct a patient's spinal curvature.

20.     Despite full compliance with bracing for two months, on January 7, 2025, x-rays taken four months after initial imaging of V.H.'s spine revealed worsening curvature.

21.     So, in just 8 weeks during which V.H. was braced, her AIS noticeably worsened; this is indicative of the conditions present in rapid progression.

22.     On April 15, 2025, V.H. underwent more imaging. The x-rays revealed unchanged curvature from prior imaging taken on January 7, 2025.

23.     On May 29, 2025, Plaintiffs consulted with Dr. Jaren Riley, MD, a pediatric orthopedic surgeon at HCA HealthONE Rocky Mountain Children's Hospital who specializes in pediatric scoliosis treatment.

24.     During the consultation, Dr. Riley confirmed that V.H.'s spine was abnormally curved, noting a large right-bending curve in V.H.'s thoracic spine with a pronounced rotational deformity. Dr. Riley also observed the compensating left-bending curve in V.H.'s lumbar spine.

25.     Dr. Riley documented noticeable rib deformity caused by V.H.'s spinal curvature.

26.     Dr. Riley told Plaintiffs that V.H.'s curve was just below the threshold for surgery, but, if it got any worse, V.H. would be an appropriate candidate for VBT.

27.     On July 2, 2025, Plaintiffs went to Dr. Riley's office for a five-week follow-up appointment.

28.     X-ray imaging obtained during this appointment revealed an increase in the size of V.H.'s Cobb angle (her spinal curvature) despite full compliance with bracing for eight months.

29.     V.H.'s Cobb angle now measured 40 degrees in her thoracic spine and 30 degrees in her lumbar spine.

30.     Dr. Riley also noted V.H. was a Risser 0, which is a medical classification indicating that V.H.'s skeletal system was still in the earliest stage of growth.

31.     A patient's Risser score is important, because VBT works by harnessing a child's remaining growth to gradually straighten the spine. Thus, the lower the Risser score, the better outcomes VBT has.

32.     In sum, by July 2025 it was evident that V.H.'s AIS continued to develop apace, that her curvature was substantial enough to justify surgery, and her spine was still developing such that its natural growth could be used in the corrective process that VBT provides.

33.     Accordingly, Dr. Riley – a leading expert in the field of pediatric scoliosis treatment – found that V.H. was an ideal candidate for VBT and recommended the procedure on segments five through twelve of her thoracic spine.

34.     Because time is of the essence for VBT's success, Dr. Riley and Plaintiffs scheduled the surgery at the earliest possible date, November 17, 2025.

**B.     History of Treatment for Adolescent Idiopathic Scoliosis**

35.     AIS is a condition that causes an individual's spine to abnormally curve and rotate in a way that worsens during periods of rapid growth, such as puberty.

36.     For decades, the standard surgical treatment for AIS was posterior spinal fusion ("PSF").

37.     PSF requires surgeons to affix rigid rods and screws to a patient's spinal vertebrae, which permanently fuse the curved vertebrae into a single, solid bone.

38.     In other words, PSF permanently eliminates motion in the fused portions of the spine. By design, PSF restricts flexibility, alters spinal biomechanics, and places added stress on adjacent, non-fused vertebrae.

39.     PSF often leads to long-term complications. The longer someone lives with the fusion, the more likely they are to develop such complications. It follows that the risks are especially high for children and adolescents who undergo the procedure. These well-recognized complications include degeneration of adjacent vertebrae, which then need to be fused together with the previously fused segments of the patient's spine.

40.     When such complications arise, more levels of a patient's spine must be fused together over time, which in turn means further reduced mobility. Thus, PSF has irreversible lifetime consequences, particularly in young people who undergo the surgery.

41.     For a 12-year-old, PSF is an unimaginable prospect. The bones of their spine will literally be melded together, foreclosing the freedom of movement that defines youthful athleticism. And, of course, such a young person will know the fusion will need to last for at least 50 years – if it doesn't, the consequences are catastrophic.



42.     In addition, recovery from PSF requires prolonged limitations on bending, twisting, lifting, and participating in sports and other high-impact activities, such as competitive dancing.

43.     While PSF can stop a spinal curve from worsening, it is only damage control at best.

44.     Given the limitations of PSF, over the last decade medical professionals developed VBT, a growth-modulating surgery designed specifically for AIS patients, whose spines haven't finished growing. The idea is to use the spine's continued growth advantageously, to correct the curve instead of straightening and fusing it together using a permanent foreign object placed in the child's body.

45.     Instead of fusing spinal segments together, VBT works by placing screws along the outer edge of the curved spinal segments, attaching those screws to a strong yet flexible cord (a "tether"), and applying tension to partially straighten the spine during surgery.

46.     As the patient grows into adulthood, the tether gradually corrects the curve while preserving spinal motion.



**Pre-Op    First Erect    6 Weeks    6 Months    1 Year**

47.     Thus, skeletal immaturity is a key factor in determining whether VBT will be successful.

48.     VBT is not an appropriate treatment for all patients diagnosed with scoliosis, or even all AIS patients. Patient selection is critical; the medical literature provides that the ideal candidate for VBT is a patient who has a Cobb angle between 40 and 60 degrees, a flexible spine, and significant growth remaining, as demonstrated by the patient's score on a Risser scale. The lower the patient's Risser score, the higher the likelihood of clinical success.

49.     In 2019, the Food and Drug Administration ("FDA") approved the use of The Tether system, the only medical device used for VBT, through a Humanitarian Device Exemption ("HDE").

50.     HDE is a form of FDA authorization that acknowledges that patients with rare conditions should still benefit from medical advancements even when traditional clinical trials are not feasible due to limited pools of patients.

51.     In approving The Tether system through the HDE, the FDA recognized that "[f]or children and adolescent patients with idiopathic scoliosis that does not respond favorably to bracing, treatment options have been limited to fusion surgeries. Today's approval provides access to a new treatment option that could improve quality of life for patients with idiopathic scoliosis."

52.     Further, the FDA noted that PSF "permanently restricts the motion of the spine and may have long-term complications such as pain, arthritis and future spinal deformities, which could require additional surgical treatment."

53.     The advantages of VBT compared to PSF are well-documented in the medical literature (and subsequent FDA re-affirmations of approval), and include, but are not limited to the following:

- Unlike PSF, VBT does not immobilize the spine, which allows patients to maintain their range of motion and flexibility;

- Unlike PSF, VBT allows the spine to continue to function as a flexible, moving structure rather than fusing parts of the spine together, thereby reducing stress and preventing future surgical intervention on adjacent segments;

- VBT patients resume normal activities, such as sports and school, sooner than patients who receive PSF;

- VBT patients lose less blood during surgery than PSF patients, thereby reducing recovery time and stress on the body;

- Because VBT is less invasive than PSF, VBT patients report less pain following surgery and take fewer opioids and other pain management medications following surgery;

- Unlike PSF, VBT works *with* growth in adolescent patients rather than stopping it, allowing a patient's curve to continue to improve as they grow into skeletal maturity.

54. While some medical literature suggests that VBT may have higher revision rates compared to PSF, not all revisions are created equal. PSF revisions are extremely complicated, and have high morbidity rates with significant blood loss and injury to surrounding soft tissue and bone. PSF revisions involve fusing more segments of a patient's spine together, resulting in even less range of motion than before. This insidious cycle can go on for the length of a patient's life, and is particularly alarming in the context of children and adolescents who undergo PSF at a young age.

55. In contrast, VBT revisions usually happen because the tether has overcorrected, or in other words, causes the spine to curve in the opposite direction. The remedy for overcorrection is a simple outpatient procedure that involves placing a camera into a patient's chest and cutting a tether for a total surgery time of 15-30 minutes.

56.    In other words, while some data suggests VBT revision rates may equal or even outpace PSF revision rates, PSF revisions are substantially more invasive and dangerous than VBT revisions. The comparison is apples and oranges.

57.    Despite the overwhelming evidence and endorsement from the FDA that VBT is promising, safe, effective, and has several key advantages over PSF, Aetna unreasonably denied V.H. coverage for the procedure.

**The Plan**

58.    Plaintiffs are beneficiaries of a health insurance plan with Aetna (the "Plan"), Policy No. 1XXCBC0901240321-30018736, offered through and sponsored by Anne Marie's employer, Sadler Dorchester Advertising d/b/a S & D Marketing Advertising ("Sadler Dorchester"). [Exhibit 2].

59.    The Plan sets forth Aetna's role. Aetna is the Third-Party Claims Administrator ("TPA") with sole authority and discretion to interpret the terms of the Plan, make claim and appeal determinations, and determine eligibility for benefits.

60.    While the Plan purports to reserve discretion to Aetna, this provision violates Colorado law and is unenforceable.[1] Thus, pursuant to C.R.S. § 10-3-1116(2), Aetna's coverage decisions are subject to *de novo* review.

61.    The Plan excludes coverage for services Aetna considers "experimental, investigation, or unproven."

62.    The Plan defines "experimental, investigational, or unproven" as:

---

[1] This issue was addressed by the U.S. District Court for the District of Colorado in *McClenahan v. Metropolitan Life Ins. Co.*, 621 F. Supp. 2d 1135 (D. Colo. 2009), which found that C.R.S. § 10-3-1116(2) overrides the policy's terms purporting to reserve discretion and is not preempted by ERISA,

A drug, device, procedure, supply, treatment, test, or technology is considered by us to **be experimental, investigational, or unproven** if any of the following apply:

- It hasn't been shown through well-conducted clinical trials or cohort studies published in peer-reviewed, evidence-based scientific literature to be safe and effective for treating or diagnosing the condition or illness for which it's meant.
  **…**

- There isn't FDA approval or clearance to market it for the proposed use.
- A national medical society, dental society, or regulatory agency has written that it's **experimental, investigational, or unproven**, or mainly for research purposes.
- It's the subject of a Phase I, Phase II, or the experimental or research arm of a Phase III clinical trial. The FDA and Department of Health and Human Services define these.
- Written procedures or consent form used by a facility **provider** says it's **experimental, investigational, or unproven**.

[Exhibit 3].

63.    The Plan defines "medically necessary" as:

Health care services or supplies that prevent, evaluate, diagnose, or treat an illness, injury, disease or its symptoms, and that are all of the following, as determined by us within our discretion:

- In accordance with "generally accepted standards of medical practice"
- Clinically appropriate, in terms of type, frequency, extent, site, place of service, duration, and considered effective for your illness, injury, or disease
- Not primarily for your convenience, the convenience of your **physician** or other health care **provider**
- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your illness, injury or disease.

Generally accepted standards of medical practice mean:

- Standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community and
- Following the standards set forth in our clinical policies and applying clinical judgment

[Exhibit 4].

64.    The Plan additionally references Clinically Policy Bulletins ("CPBs"), which are solely and exclusively developed and maintained by Aetna for use in applying the exclusions listed above.

**Aetna's October 15, 2025 Denial**

65.    On October 9, 2025, Plaintiffs (through Dr. Riley) submitted a request to Aetna for VBT surgery, scheduled for November 17, 2025.

66.    Aetna issued a denial within 6 days, on October 15, 2025 (the "First Denial").

67.    The First Denial relied on the CPB for Idiopathic Scoliosis (which is *not* limited to adolescent only), and stated that "[m]edical studies don't prove that this PROCEDURE is effective for treatment of your condition." (capitalization in original).

68.    Aetna has recently come under fire for its use of and reliance on CPBs, which are unilaterally created, non-negotiated documents that do not override the terms of any of Aetna's plans, yet are treated (by Aetna) as binding coverage interpretations. They're almost always used to support claim denials (rather than approvals).

69.    The First Denial gave no detail beyond pointing to the broad, all-age Idiopathic Scoliosis CPB.

70.    The First Denial did not say who reviewed the CPB and determined that VBT was ineffective for V.H. It didn't explain why or how this broad bulletin precluded this treatment for

V.H.'s particular circumstance, *i.e.*, for a young patient who uniquely fit the highly limited criteria under which VBT is most effective.

71.    Upon information and belief, Aetna did not have the claim reviewed by someone with experience, training, or education in pediatric orthopedic surgery before issuing the First Denial.

72.    Put simply, Aetna did not provide any information which may have explained the basis for its conclusion, in contravention of its duties under 29 U.S.C. § 1133 to set forth the specific reasons it was denying coverage.

73.    The First Denial stated that Plaintiffs, or an authorized representative, could request an appeal, including an expedited appeal if the treating physician "believes a delay in making a decision could put your life, health or ability to regain full function at serious risk, or could cause you severe pain."

74.    Dr. Riley attested to the reality that every day this child goes without VBT, her window of time to receive the only surgery that can preserve the decades of mobility ahead narrows.

**The November 5, 2025 Appeal**

75.    The Plan requires participants to complete two levels of internal appeals (unless the claim is urgent, in which case the claim can be reviewed internally at the same time as the external review), to exhaust the appeals process.

76.    On November 5, 2025, Plaintiffs appealed the First Denial (the "First Appeal").

77.    This time, Plaintiffs requested the assistance of a Patient Advocate through PRIA Healthcare.

78.     Candice Brewer was their PRIA Patient Advocate.

79.     The First Appeal was accompanied by two letters written by Anne Marie, one to
the Aetna Appeals Review Committee, and one to Dr. Kornitzer, the Chief Medical Officer at
Aetna. [Exhibits 5 & 6].

80.     The Committee Letter is a mother's plea. It explains that her daughter – still a child
– has found a passion, and that passion centers on mobility. It used to be that girls and boys like
V.H. were out of luck and had to accept dashed dreams and a fragile life ahead because PSF is so
restrictive and prone to degradation over time. Miraculously though, the scientific community has
found a corrective, safe, effective, and FDA-approved way to avoid that life sentence for kids like
V.H. Through tethering, V.H.'s young, growing spine could be *fixed* instead of immobilized with
permanent fusion.

81.     But, Anne Marie stressed, time was of the essence. VBT relies on the spine to *still
be growing*. If Aetna's denials held up the process, Anne Marie's little girl could lose this chance
– and any hope of the healthier, stronger, more passionate life it would offer – altogether.



82.     In the Dr. Kornitzer Letter, Anne Marie stated that V.H. meets all FDA-established criteria for VBT in that V.H. has a Cobb angle of 40 degrees, is a Risser 1, and has failed bracing despite full compliance.

83.     Anne Marie also wrote: "The timing of this intervention is critical as her growth window makes now the optimal opportunity to achieve the best possible outcome. Traditional spinal fusion would permanently limit her motion and affect her ability to dance and live fully. VBT, by contrast, offers potential not only to correct her curve but to preserve flexibility, mobility, and confidence."

**The November 7, 2025 Denial**

84.     In response to the First Appeal, Aetna issued another denial on November 7, 2025 (the "Second Denial").

85.     Aetna reviewed the following information in responding to the First Appeal: the appeal request, the October 15, 2025 denial letter, "medical literature," progress notes, radiology report, resolution letter, Aetna's Clinical Policy Bulletin on Idiopathic Scoliosis, and the Summary of Plan Description ("SPD") issued to Plaintiffs.

86.     Aetna did not disclose the medical professional(s) who reviewed information submitted with the First Appeal.

87.     Aetna merely stated that "[a]n appeals nurse consultant with the professional designation of RN, a medical director, board certified in orthopaedics, with a professional designation of MD, and a complaint and appeal analyst" participated in the review of the First Appeal.

88.    Upon information and belief, no medical professional specializing in pediatric orthopedic surgery reviewed any information submitted with the First Appeal.

89.    This is particularly troubling given that VBT is a surgery *specifically* indicated with regard to a *pediatric* condition, AIS.

90.    Thus, it is no surprise that the reviewer defaulted to merely citing general Plan provisions without applying any specific information about VBT, its safety and efficacy for V.H.'s specific presentation, or relevant details of V.H.'s presentation.

91.    The basis for Aetna's determination was that "Aetna considers vertebral body tethering experimental and investigational and therefore not medically necessary because of insufficient evidence of its effectiveness for this indication."

92.    Aetna again did not explain what it meant by "effectiveness," nor did it engage in the dialogue required and contemplated by ERISA setting forth what kind of "evidence" it would deem "sufficient" to demonstrate VBT was medically appropriate for V.H.

93.    As alleged above, Aetna's denial was based, at least in part, on its CPB on Idiopathic Scoliosis.

94.    Upon information and belief, Aetna has developed these internal CPBs in order to support coverage denials with respect to certain medical treatments.

95.    Per the disclaimer on Aetna's website, "[w]hile CPBs define Aetna's clinical policy, medical necessity determinations in connection with coverage decisions are made on a case by case basis."

96.    Upon information and belief, that is not true.

97.    V.H.'s denials indicate that Aetna did not (and does not) account for patients' unique presentations in assessing whether a condition is excluded as experimental/investigational or not medically necessary.

98.    Aetna does not have a CPB specifically developed for V.H.'s diagnosed medical condition, AIS.

99.    So, Aetna relied on its general CPB 0398, "Idiopathic Scoliosis," to deny coverage to V.H.

100.    Aetna's CPB 0398, "Idiopathic Scoliosis," then, sets forth Aetna's position regarding VBT for a *different* diagnosis:

> "The following procedures and correction devices are considered experimental, investigational, or unproven because the effectiveness of these approaches has not been established: vertebral body stapling and vertebral body tethering".

101.    Upon information and belief, Aetna recently reversed its coverage decision for a participant after an external reviewer analyzed the participant's medical history and applied findings in the medical literature to conclude that VBT was not experimental or investigational and was medically necessary.

102.    Upon information and belief, this member was well-matched to V.H. in that the member and V.H. have similar Cobb angles, flexibility in their spines, and low Risser scores.

103.    There is a serious discrepancy between Aetna's position (as stated in CPB 0398) that VBT is experimental and investigational, and its determination that, for some patients, VBT is not experimental or investigational.

104.    While Aetna stated it reviewed "medical literature" in assessing V.H.'s claim, it provided *zero* information about what literature was reviewed, by whom, and what conclusions

18

the reviewer drew. There is no summary, discussion, critique, or analysis of any medical literature anywhere in the Second Denial.

105.    Instead, Aetna merely recited that there was "insufficient evidence" of VBT's effectiveness for the treatment of AIS.

106.    Aetna did not cite to *any* medical study, evidence, or patient-specific factors in the Second Denial.

107.    The failure to provide Plaintiffs with the specific reasons for the denial constitutes a direct violation of 29 U.S.C. § 1133.

108.    The Second Denial stated that Plaintiffs could request a third-party external review of Aetna's decision, so long as the treating provider attested that waiting for a standard review to be completed would jeopardize the health of the member.

109.    Dr. Riley attested to the need for an expedited external appeal, evincing the urgency of V.H.'s condition.

**The November 7, 2025 External Appeal**

110.    The same day Plaintiffs received the Second Denial, they submitted a request for an expedited external review.

111.    The Second Appeal materials included letters written by V.H. and Dr. Riley.

112.    The letter written by V.H. is equal parts heartbreaking and eye-opening. It reads, in pertinent part:

> "Having scoliosis makes a lot of things hard. At school, sitting in chairs all day hurts my back. It gets sore and stiff, and then I don't pay attention as much because I'm trying to find a way to sit that doesn't hurt … I've been dancing since I was little, and I'm on a competitive team. It's what makes me happy. But now some moves hurt or feel weird because my back is uneven … It also makes me feel different from other kids. People notice my

back looks different or that one side sticks out. Some kids make comments or ask questions that make me feel embarrassed. I try to ignore it, but it still hurts. I just want to feel normal, like everyone else."



113.    The letter written by Dr. Riley states, in pertinent part:

"VBT is being recommended by the treating surgeon, Jaren Riley, because it offers meaningful curve correction while preserving spinal growth potential and mobility—an essential consideration for a skeletally immature patient. [V.H.] is an active competitive dancer that trains year-round. VBT is the best option for corrective surgery while preserving her spinal mobility."

114.    Dr. Riley's letter explained that VBT using The Tether system was approved by the FDA in 2019 under an HDE, which exists for rare conditions like AIS.

115.    Importantly, as stated by Dr. Riley, HDE approval is *not* equivalent to a designation of investigational or experimental use, but *rather* allows the use of medical devices in treatments for conditions that pose challenges to data collection.

116.    Dr. Riley's letter highlighted the fact that in 2024, the FDA re-affirmed its approval of VBT using The Tether system after reviewing updated safety and clinical data outcomes, finding that "the probable benefits outweigh the probable risks for use of this device."

117.    Dr. Riley also referenced several observational and comparative studies which support the safety and efficacy of VBT for patients with the same clinical indicators as V.H., as well as guidance from the Scoliosis Research Society ("SRS") and Pediatric Orthopedic Society of North America ("POSNA") supporting payer coverage for VBT in skeletally immature patients (like V.H.) diagnosed with AIS (like V.H.).

**The November 11, 2025 Denial**

118.    Despite the overwhelming evidence supporting the safety and efficacy of VBT, Aetna, in cursory fashion, denied V.H.'s surgery a third time, maintaining that VBT was experimental and investigational and not medically necessary for V.H.

119.    Aetna enlisted the services of Medical Care Management Corporation ("MCMC"), an Independent Review Organization, to conduct its external review of Plaintiffs' appeal.

120.    On November 11, 2025, Aetna advised Plaintiffs that it was denying the request for VBT on the basis that VBT is "experimental/ investigational." (the "Third Denial").

121.    Aetna's Third Denial included the MCMC reviewer's report.

122.    Upon information and belief, MCMC has a known bias against insureds. It has been castigated for marketing materials which advertise its ability to save payers money.

123.    The MCMC reviewer noted progression of V.H.'s curvature despite bracing, and her most recent x-ray showing a 40-degree curve in her lumbar spine and 30-degree curve in her

lumbar spine, as well as V.H.'s Risser score of 0 (all indicators of her presentation as an ideal

candidate for successful VBT surgery).

124.    In asking the MCMC reviewer to review its coverage decision, Aetna asked and the

MCMC reviewer answered the following:

> Question: Is the requested service unproven or experimental/investigational
> (E/I) as defined by the Summary Plan Description?
>
> Answer: There was a lack of current evidence showing that this procedure
> provides improved outcomes over standard treatment options for scoliosis
> which includes a posterior spinal fusion. In this case, the patient has a
> flexible 40-degree curvature. However, there is a lack of scientific evidence
> showing that the tethering procedure provides improved outcomes over
> standard treatments with a higher failure rate noted in the scientific
> literature. Thus, the treatment would not be approved since it is considered
> experimental / investigational according to the summary plan description.

125.    The SPD is not a binding contract and does not define the scope of coverage.

126.    Aetna did not ask the MCMC reviewer whether VBT was covered by the terms of

the Plan, but rather whether this vital and urgent treatment was covered under an irrelevant

provision of a non-binding contract.

127.    The MCMC reviewer did not explain further what was meant by "sufficient

evidence," "improved outcomes," or "failure rate," even though these terms are distinctly

important when considering the ramifications of PSF versus VBT.

128.    The MCMC reviewer did not address any of Dr. Riley's opinions or medical

literature cited by him, despite his request for a peer-to-peer review.

129.    The MCMC reviewer did not provide an analysis of the benefits of VBT compared

to PSF.

130.    Further, nothing in the Plan states that a procedure must be *more effective* than another to escape a determination that it is experimental, investigational, or unproven. Such a requirement would be preposterous, because there are always pros and cons in surgical interventions.

131.    Aetna also asked the MCMC reviewer whether the proposed treatment was medically appropriate for V.H.

132.    In asking the MCMC reviewer whether the proposed treatment was medically appropriate, Aetna provided the wrong provision of an irrelevant and non-binding document.

133.    Aetna provided the MCMC reviewer with the "experimental, investigational, or unproven therapies" section of its SPD governing *clinical trials*, but Plaintiffs were not seeking VBT in a *clinical trial*.

134.    The MCMC reviewer did not give any analysis of why VBT was not medically appropriate for V.H. It did not rebut any of Dr. Riley's opinions or even mention the FDA's approval, subsequent re-affirmations, or the medical literature included in or cited by any materials submitted during the appeals process.

135.    Rather, the MCMC reviewer merely recited the SPD definition of experimental or investigational *in the context of clinical trials* and stated "No, the proposed treatment is not medically appropriate for this member," and again stated "The requested service is unproven and experimental/investigational (E/I) as defined by the Summary Plan Description."

136.    While the MCMC reviewer cited specific articles in the references section of the report, the reviewer did not detail the contents or findings of the articles, provide any analysis of

them, or even attempt to describe their applicability, strengths, and weaknesses. Thus, while some literature is merely referenced, there is no substantive discussion or analysis provided.

137.    No reasonable insurer and fiduciary would consider this cursory and conclusory letter credible evidence, sufficient to outweigh the opinion of an expert-in-the-field treating provider.

138.    This failure is more evidence that Aetna failed to provide adequate notice to Plaintiffs of the specific reasons for its denial and likewise failed to provide a full and fair review of its decision denying Plaintiffs' request for pre-authorization.

139.    In addition, Dr. Riley requested but didn't recieve a peer-to-peer review. While Aetna did not reveal the identity of the MCMC reviewer, the report states that the reviewer is board certified in orthopedic surgery and is fellowship trained in *adult* spinal diseases.

140.    VBT is a specialized surgery for children and adolescents performed by pediatric orthopedic surgeons, not people who are trained in adult spinal diseases.

141.    Aetna's handling of the request and appeals process, including its ultimate denial of coverage, was unreasonable, arbitrary, and capricious. It departed from the record evidence in unsupportable ways and was attended by serious procedural irregularities, including a complete failure to provide any analysis whatsoever of the medical literature regarding VBT, the specifics of V.H.'s case, or otherwise engage with Dr. Riley's urgent, expert recommendations.

142.    All of this is particularly troubling in light of the fact that there is a narrow timeframe for patients to receive VBT before losing the opportunity forever and being forced to undergo invasive, life-altering PSF.

143.    As is well-documented by the medical literature and stated by Dr. Riley, patients diagnosed with AIS are only appropriate candidates for VBT for a limited amount of time.

144.    Aetna's unreasonable and unsupported denial has – and continues to – delay this procedure for V.H., causing her substantial harm and risking her chance to benefit from this safe and effective surgery.

145.    The procedural irregularities throughout the initial denial and appeals process present this Court with a basis to conclude that Aetna's handling of Plaintiffs' request cannot be afforded a deferential review standard in litigation.

146.    This Court must also take into consideration that Aetna is both the payer and TPA of the Plan, and must therefore lower the deference given to Aetna's denial.

147.    Thus, Aetna's denial is subject to *de novo* review.

148.    Plaintiffs have satisfied all conditions precedent under the Plan.

## FIRST CLAIM FOR RELIEF
### (Violation of 29. U.S.C. § 1132(a)(1)(B))

149.    Plaintiffs incorporate by reference each and every allegation of this Complaint as if fully set forth herein.

150.    Plaintiffs bring this claim under 29 U.S.C. § 1132(a)(1)(B) to recover benefits due and to enforce and clarify their rights to the benefits at issue.

151.    Aetna's denial of the Plaintiffs' claim for benefits was incorrect, unreasonable, arbitrary, and capricious, and it was unsupported by the substantial weight of the evidence presented to it.

152.     Aetna's handling of the Plaintiffs' claim was attended by serious procedural irregularities.

153.     Aetna ignored information that confirmed Plaintiffs' entitlement to coverage for V.H.'s VBT surgery under the Plan.

154.     Aetna was operating under an inherent conflict of interest, because it is both the payer of benefits and the TPA tasked with administering the claim.

155.     Under 29 U.S.C. § 1132(a)(1)(B) and 1132(g), Plaintiffs are entitled to recover benefits due to them under the Plan, as well as an award of reasonable attorneys' fees and costs incurred in bringing this action.

156.     Under C.R.S. § 10-3-1116(2), Aetna's refusal to pay the Plaintiffs' benefits under the Plan is subject to *de novo* review by this Court.

## SECOND CLAIM FOR RELIEF
### (Violation of 29 U.S.C. § 1133)

157.     Plaintiffs incorporate by reference each and every allegation of this Complaint as if fully set forth herein.

158.     Aetna functioned and continues to function as the plan administrator of Plaintiffs' Plan. During all relevant times, Aetna was required to provide both "adequate notice" "setting forth the specific reasons" for its denial, as well as "a full and fair review" of its decision denying Plaintiffs' claim, in accordance with 29 U.S.C. § 1133.

159.     ERISA and its implementing regulations set forth minimum standards for claim handling, appeals, and notice to members. In engaging in the conduct described herein, Aetna failed to comply with its obligations under 29 U.S.C. § 1133.

160.    Aetna failed to disclose the "specific reasons" for its denials of Plaintiffs' claim, did not provide a "full and fair review," including review and analysis of V.H.'s medical history, the opinions of her treating physician, Dr. Riley, or any medical literature whatsoever.

161.    Indeed, Aetna failed to engage in any meaningful dialogue with V.H.'s treating provider, despite its obligations to do so under 29 U.S.C. § 1133.

162.    As a direct and proximate result of Aetna's violations, Plaintiffs were deprived of the information necessary to understand the basis for the denial, the opportunity to submit targeted evidence responsive to Aetna's reasons for its denials, and accurate determination of benefits due under the terms of the Plan.

163.    Aetna's failure to comply with ERISA's minimum procedural safeguards renders its denial of coverage arbitrary and capricious and not the product of a full and fair review.

**WHEREFORE**, Plaintiffs, Anne Marie Hukriede and V.H., respectfully request that this Court enter judgment in their favor and against Aetna, as follows:

a.    For injunctive relief under 29 U.S.C. § 1132(a)(3) enjoining Aetna from denying coverage for VBT as to Plaintiffs;

b.    For declaratory relief under 29 U.S.C. § 1132(a)(3) that Aetna has breached the terms of its Plan;

c.    For clarification of Plaintiffs' rights to future benefits under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B);

d.    For recovery of all benefits due under the terms of the Plan;

e.    For all pre- and post-judgment interest, as allowed by law;

f.    For reasonable attorneys' fees and costs of suit herein as provided by statute;

g.     For such other and further relief as the law permits and as this Court deems just and

proper.

DATED this 1st day of December 2025.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/ Annika K. Adams*
Bradley A. Levin
Robyn Levin
Annika K. Adams
455 Sherman Street, Suite 490
Denver, Colorado 80203
Telephone: (303) 575-9390
Fax: (303) 575-9385
brad@lsw-legal.com
robyn@lsw-legal.com
annika@lsw-legal.com
***Attorneys for Plaintiffs***